IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF MISSISSIPPI
GREENVILLE DIVISION

TRAVIS S. WILLIAMS                                                    PLAINTIFF

v.                                                    CAUSE NO. 4:22-CV-102-SA-DAS

HOLLANDALE SCHOOL DISTRICT                                           DEFENDANT

ORDER AND MEMORANDUM OPINION

On July 11, 2022, Travis S. Williams initiated this lawsuit by filing his *pro se* Complaint
[1] against Hollandale School District ("the District"). The District filed a Motion for Summary
Judgment [33], which is now ripe for review. Having analyzed the filings, as well as the applicable
authorities, the Court is prepared to rule.

*Relevant Background*

Prior to his termination, Williams was a longstanding employee with the District. He began
his employment there in August 2008 and worked as a special education teacher until his eventual
termination on February 11, 2021.

The pertinent events began in July 2020. Pursuant to the Districtwide calendar for the 2020-
2021 school year, all staff members were to report for the first day of work on July 29, 2020.
Williams did not report that day. Eventually, Williams reported for the 2020-2021 school year, but
the District contends that he regularly failed to attend as required.

Nonetheless, on October 15, 2020, Williams underwent laparoscopic gallbladder removal
surgery. Although it is undisputed that Williams was entitled to (and provided) medical leave, the
amount of time he needed to recover from the surgery and the corresponding documentation is not
so clear.

Williams first provided a letter dated October 16, 2020, from Merit Health Central, indicating that he was "to remain off work . . . until return to clinic . . . on 10/28/20." [33], Ex. 10 at p. 19. Documentation from October 25, 2020 and October 28, 2020 seemingly indicates that Williams had some post-operative difficulties, such as abdominal pain, nausea, and vomiting, but the documentation from those dates is unclear as to an appropriate time for Williams to return to work. *See* [33], Ex. 4 at p. 24-28. In another medical chart related to a November 11, 2020 doctor's visit, Williams' medical provider, James R. Rooks, M.D., explained:

> The patient, Travis Williams, is a 40 year old African American/Black male, who returns for a post-operative follow-up visit after undergoing laparoscopic gallbladder with common duct exploration. . . . Clinically is doing well thinking return to work at his convenience. He is at high stress environment and like to COVID-19 wait [sic] till 1st [of] the year.

*Id*. at p. 38.

Despite this letter, Williams did not return to work on the first work day of the year, which was January 6, 2021. Rather, on January 12, 2021, Williams provided a doctor's excuse from The Greenville Clinic, which indicated that he was able to return to work on January 13, 2021, the next day. *See* [33], Ex. 10 at p. 20. However, Williams did not return to work the next day but instead emailed the District Superintendent, Dr. Mario Willis, requesting that he be permitted to work from home. *See* [33], Ex. 13 at p. 131-32. As the basis for the request, Williams referenced his past surgeries and the COVID-19 pandemic and ultimately requested that he be permitted to conduct his teaching duties remotely.[1]

Williams' employee file also contains a doctor's excuse from Dr. Rooks dated January 20, 2021. *See* [33], Ex. 10 at p. 23. That excuse provides that Williams had been under Dr. Rooks'

---

[1] To provide further background, at this particular time in the pandemic, students were still attending school virtually, but the District required teachers to teach from the school campus.

care from October 15, 2020 through January 25, 2021. On the "Restrictions" part of the excuse, Dr. Rooks selected "None." *Id*.

On January 29, 2021, Williams was notified that his request to work remotely was denied. During this time period, Williams' work attendance was irregular. According to the District's documentation, from January 25, 2021 through February 10, 2021, Williams came to work only once. That one date was February 8, 2021, and the time sheet indicates that Williams clocked in at 7:44 A.M. and clocked out at 8:37 A.M. *See* [33], Ex. 10 at p. 47-48. According to the District, on the February 8, 2021 date, Williams elected to teach from his vehicle, as opposed to in his classroom as required. Williams admitted as much in his deposition. *See* [33], Ex. 11 at p. 11.

On February 10, 2021, Superintendent Willis sent a letter to Williams notifying Williams of Willis' recommendation of termination. The next day, Williams acknowledged receipt of the recommendation and requested "a full due process hearing on all issues relating to [his] termination." [33], Ex. 10 at p. 2.

The hearing commenced on March 16, 2021. Williams did not call any witnesses or testify on his own behalf. Prior to the hearing's conclusion, Williams submitted a letter to Willis stating as follows:

> While I contend I have done nothing wrong nor have I done anything warranting a termination, I have decided I do not wish to return to employment with the Hollandale School District under any circumstances. Therefore, this makes continuation of my disciplinary hearing unnecessary and I therefore do not intend to return to the campus for any further hearings.

[33], Ex. 15 at p. 1.

On May 26, 2021, Williams filed a Charge of Discrimination with the EEOC, alleging that the District violated the ADA in its handling of his employment matters. He then filed this lawsuit. As noted above, Williams is proceeding *pro se*. His Complaint [1] is the *pro se* form Complaint

3

from this Court's website. The form instructs litigants to select the applicable "complained of" conduct and provide a date for the occurrence of the alleged conduct. Williams selected the following claims and provided the following dates for each claim: (1) "Termination of my employment" on February 10, 2021; (2) "failure to accommodate my disability" on February 10, 2021; (3) "terms and conditions of my employment differ from those of similar employees" on February 10, 2021; (4) "retaliation" on August 21, 2020; and (5) "harassment" on August 21, 2020 and February 10, 2021. [1] at p. 4. In the factual allegations section, Williams alleges:

> I was not allowed the accommodation of working from home and later fired during the uprise of Covid 19. After three surgeries, my request to work from home was denied as part of an ongoing retaliation from the superintendent, Dr. Mario Willis. However, there were other staff member[s] who were allowed to work from home with approval from Dr. Willis including himself.

[1] at p. 4-5.

Through the present Motion [33], the District seeks dismissal of all claims.

*Summary Judgment Standard*

Summary judgment is warranted when the evidence reveals no genuine dispute regarding any material fact, and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Nabors v. Malone*, 2019 WL 2617240, at *1 (N.D. Miss. June 26, 2019) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)).

"The moving party 'bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which it believes demonstrate the absence of a genuine issue of material fact.'" *Id.* (quoting *Celotex*, 477 U.S. at 323). "The

4

nonmoving party must then 'go beyond the pleadings' and 'designate specific facts showing that there is a genuine issue for trial.'" *Id.* (quoting *Celotex*, 477 U.S. at 324). Importantly, "the inferences to be drawn from the underlying facts contained in the affidavits, depositions, and exhibits of record must be viewed in the light most favorable to the party opposing the motion." *Waste Mgmt. of La., LLC v. River Birch, Inc.*, 920 F.3d 958, 964 (5th Cir. 2019) (quoting *Reingold v. Swiftships, Inc.*, 126 F.3d 645, 646 (5th Cir. 1997)). However, "[c]onclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial." *Nabors*, 2019 WL 2617240 at *1 (citing *TIG Ins. Co. v. Sedgewick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) (additional citations omitted).

*Analysis and Discussion*

As noted above, Williams asserts five different theories of liability. The District makes numerous arguments in favor of dismissal.

I.      *Preliminary Matters*

Prior to addressing the merits of Williams' claims, the Court first looks to the District's arguments for dismissal based on preliminary procedural issues.

First, the Court will address administrative exhaustion. In order to properly bring a claim under the ADA, "a plaintiff must first exhaust his administrative remedies. To do so, he must file a charge with the EEOC that identifies the employment practices he is challenging." *Owens v. Dallas Cnty. Comm. Coll. Dist.*, 793 F. App'x 298, 300 (5th Cir. 2019) (per curiam) (citing *Taylor v. Books a Million, Inc.*, 296 F.3d 376, 378-79 (5th Cir. 2002); 42 U.S.C. §§ 2000e-5(e)(1), (f)(1)). Ordinarily, a plaintiff cannot bring a claim "on an action that was not previously asserted in a formal charge of discrimination to the EEOC, or that could not 'reasonably be expected to grow out of the charge of discrimination.'" *Filer v. Donley*, 690 F.3d 643, 647 (5th Cir. 2012) (quoting

*Pacheco v. Mineta*, 448 F.3d 783, 789 (5th Cir. 2006)). "The purpose of this exhaustion doctrine is to facilitate the administrative agency's investigation and conciliatory functions and to recognize its role as primary enforcer of anti-discrimination laws." *Id*. Additionally, "[t]he Fifth Circuit has observed that 'one of the central purposes of the employment discrimination charge is to put employers on notice of the existence and nature of the charges against them.'" *Clark v. Auger Servs., Inc.*, 443 F. Supp. 3d 685, 701 (M.D. La. 2020) (quoting *Manning v. Chevron Chem. Co., LLC*, 332 F.3d 874, 878 (5th Cir. 2003)) (additional citations omitted).

Here, Williams' EEOC Charge alleges the following:

> I began employment August 2008. I recently worked as a Special Education Teacher until I was discharged from employment on February 11, 2021.
>
> On January 13, 2021, I requested a reasonable accommodation from my employer to work from my home. I was never provided any written communication indicating that the request was approved or denied.
>
> I believe I was discriminated against in violation of The Americans with Disabilities Act of 1990, as amended. I was denied a reasonable accommodation from my employer, even though I provided correspondence to them indicating the medical conditions I was tending to, per my doctor's guidance.
>
> I believe I have been retaliated against in violation of [the ADA]. I was discharged from my employment shortly after requesting a reasonable accommodation.

[1], Ex. 1 at p. 4-5.

Arguing that Williams' claims in his Complaint [1] exceed the scope of his EEOC Charge, the District contends "[nowhere] in Plaintiff's EEOC Charge did he claim that because of some disability, he suffered terms and conditions of his employment that differed from those of other similar employees. Nor did Plaintiff allege any facts in his EEOC Charge that could even suggest that he suffered harassment due to some disability." [34] at p. 13-14.

6

While recognizing that the wording of EEOC Charges and the allegations in subsequent complaints are typically not identical, the Court agrees with the District's position to some extent. Williams' Charge certainly should have placed the District on notice that Williams was asserting that the District failed to accommodate his purported disability and retaliated against him. And to the extent Williams now claims he was treated differently than other similarly situated employees, the Court finds the claim to be of the type that would "reasonably be expected to grow out of the charge of discrimination." *Filer*, 690 F.3d at 647. In reaching that conclusion, the Court notes the Fifth Circuit's directive that "the scope of an EEOC complaint should be construed liberally." *Pacheco*, 448 F.3d at 788 (citing *Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 463 (5th Cir. 1970)). Construing the Charge liberally, the Court declines to altogether preclude Williams' claim based on different treatment of similarly situated employees.

However, on the other hand, even under the broadest interpretation of the Charge, nothing contained therein would have notified the District of Williams' contention that he was subjected to harassment. The word "harassment" never appears in the Charge. While that fact alone is not necessarily dispositive, none of the allegations are of the type that this Court would expect to be included with a claim of harassment. In other words, the Court finds that Williams' harassment claim exceeds the scope of the EEOC Charge and therefore must be dismissed for failure to exhaust administrative remedies. *See*, *e.g.*, *Filer*, 690 F.3d at 647.

There is also a time limit within which an EEOC Charge must be filed, as "a plaintiff must exhaust administrative remedies by filing a charge with the EEOC within 180 days of the discriminatory action." *Sambrano v. United Airlines, Inc.*, 2022 WL 486610, at *5 (5th Cir. Feb. 17, 2022) (quoting *Ernst v. Methodist Hosp. Sys.*, 1 F.4th 333, 337 (5th Cir. 2021); *see also McCollum v. Puckett Mach. Co.*, 628 F. App'x 225, 228 (5th Cir. 2015) (citing 42 U.S.C. §

12117(a); 42 U.S.C. § 2000e-5(e)(1)) ("Title I of the ADA requires that claimants file a charge with the EEOC as a prerequisite to filing suit in federal court within 180 days of the alleged unlawful employment practice.").

Here, Williams' EEOC Charge is clearly dated May 26, 2021. Thus, for the Charge to be timely, any allegedly unlawful practices must have occurred within 180 days of that date. The Charge itself references January 13, 2021 (the date Williams allegedly requested an accommodation) and February 11, 2021 (the date of his termination). Both of those dates are clearly within the 180-day timeframe.

However, the allegations in Williams' Complaint [1] go beyond those dates. For his retaliation claim, Williams lists the date of occurrence as August 21, 2020. This date is clearly outside of the 180-day window. The Court does note, though, that, in his EEOC Charge, Williams alleges that he believes he was "retaliated against in violation of [the ADA]. I was discharged from my employment shortly after requesting a reasonable accommodation." [1], Ex. 1 at p. 4-5. This leads the Court to believe that Williams may have included the wrong date in his Complaint [1], as he makes clear in the Charge that the retaliation claim was based on the purported request of a reasonable accommodation in January 2021 and the subsequent termination shortly thereafter.

Recognizing the need to construe EEOC Charges liberally, as well as Williams' *pro se* status, the Court will not altogether dismiss his retaliation claim on this basis. However, to the extent that Williams' Complaint [1] is actually based on any conduct that occurred in August 2020, it is time barred.

Setting aside those issues, the Court also notes an issue associated with Williams' Response [36]. Although the District in its Memorandum [34] provided numerous legal arguments in favor of dismissal, Williams' Response [36] includes only factual allegations and makes no arguments

in opposition to the *legal* positions taken by the District. This Court has on numerous occasions held that a party's failure to respond to properly supported arguments at the summary judgment stage constitutes an abandonment of that party's claim. *See*, *e.g.*, *Tubwell v. Specialized Loan Serv., LLC*, 2019 WL 1446362, at *3 (N.D. Miss. Mar. 29, 2012) (noting that the non-movant's failure to respond to the moving party's motion for summary judgment on certain claims "amounts to an abandonment of [those] claims"); *Scott v. Spencer Gifts, LLC*, 2015 WL 4205242, at *1 (N.D. Miss. July 10, 2015) ("In their response, Plaintiffs have made no argument and offered no proof in support of their claims of intentional infliction of emotional distress and failure to train or supervise, and thus the Court finds these theories to be abandoned."); *Sanders v. Sailormen, Inc.*, 2012 WL 663021, at *3 (N.D. Miss. Feb. 28, 2012) (collecting cases) ("Failure to address a claim results in the abandonment thereof."). And although Williams is proceeding *pro se* and thus entitled to *some* leniency, his *pro se* status does not excuse his complete failure to comply with the general rules of litigation. *See*, *e.g.*, *Miller v. Tower Loan of Miss., LLC*, 2022 WL 3093292, at *2 (N.D. Miss. Aug. 3, 2022) ("This Court has on numerous occasions expressed that *pro se* litigants should be extended some leniency; however, a litigant's *pro se* status does not negate the duty to comply with general rules of litigation.") (citations omitted). In accordance with this well-established authority, it would be appropriate for the Court to dismiss Williams' claims due to abandonment.

As the above analysis illustrates, Williams' lawsuit is replete with procedural issues. The Court could dismiss the lawsuit based on those grounds alone. Nonetheless, out of an abundance of caution and leniency, the Court will analyze the merits of his claims.

II.     Merits

Generally speaking, "[t]he ADA prohibits covered employers from 'discriminating against a qualified individual on the basis of disability.'" *Green v. United Parcel Serv., Inc.*, 847 F. App'x 207, 210 (quoting 42 U.S.C. § 12112(a)). All of Williams' claims fall under the purview of the ADA, but he alleges multiple different theories. The Court will separately address the merits of each claim.

A.     Termination of Employment

"In a discriminatory-termination action under the ADA, the employee may either present direct evidence that he was discriminated against because of his disability or alternatively proceed under the burden-shifting analysis first articulated in *McDonnell Douglas*." *Clark v. Champion Nat'l Sec., Inc.*, 952 F.3d 570, 579 (5th Cir. 2020) (quoting *EEOC v. LHC Grp., Inc.*, 773 F.3d 688, 694 (5th Cir. 2014)).

Under the familiar *McDonnell Douglas* framework, "[t]o establish a prima facie discrimination claim under the ADA, a plaintiff must prove: (1) that he has a disability; (2) that he was qualified for the job; and (3) that he was subject to an adverse employment decision on account of his disability." *LHC Grp.*, 773 F.3d at 697.

Looking to the first element, "[i]n this context, the law defines the term 'disability' in three ways: 'a physical or mental impairment that substantially limits one or more major life activities of such individual; a record of such an impairment; or being regarded as having such an impairment.'" *McKnight v. Renasant Bank*, 2022 WL 1342649, at *3 (N.D. Miss. May 3, 2022) (quoting 42 U.S.C. § 12102(1)(A-C)). "A plaintiff who seeks to prove [he] is disabled under the ADA's definition of disability, subsection (A), must prove that [he] has a physical or mental impairment." *EEOC v. Chevron Phillips Chem. Co., LP*, 570 F.3d 606, 614 (5th Cir. 2009) (citing

42 U.S.C. § 12102(2)(A)). A "physical impairment" is defined as "any physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological; musculoskeletal; special sense organs; respiratory, including speech organs; cardiovascular; reproductive, digestive, genito-urinary; hemic and lymphatic, skin; and endocrine." *Id*. (quoting 29 C.F.R. § 1630.2(h)(1)). But "[m]erely having an impairment . . . does not make one disabled for purposes of the ADA. Plaintiffs also need to demonstrate that the impairment substantially limits a major life activity." *Id*. (citing *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195, 122 S. Ct. 681, 151 L. Ed. 2d 615 (2002)). As to "major life activities," the Fifth Circuit has explained:

> "Major life activities" are "those activities that are of central importance to daily life." The Equal Employment Opportunity Commission's regulations implementing the ADA provide a non-exhaustive list of "major life activities." Such activities including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." "To be substantially limited means to be unable to perform a major life activity that the average person in the general population can perform, or to be significantly restricted in the ability to perform it." In making that determination, the EEOC has advised that we consider: (i) the nature and severity of the impairment, (ii) the duration or expected duration of the impairment; and (iii) the permanent or long term impact, or the expected permanent or long term impact of or resulting from the impairment."

*Hale v. King*, 642 F.3d 492, 500 (5th Cir. 2011) (citations omitted).

In his Complaint [1], Williams notes that he underwent "three surgeries[.]" [1] at p. 4. The documentation outlined above supports that allegation. However, there is nothing in the record to indicate that that impairment was ongoing at the time of Williams' termination. "The ADA requires an individualized inquiry beyond the mere existence of a hospital stay." *Winters v. Pasadena Indep. Sch. Dist.*, 124 F. App'x 822, 823 (5th Cir. 2005) (quoting *Burch v. Coca-Cola Co.*, 119 F.3d 305, 317 (5th Cir. 1997)). This is because "[t]o accept the proposition that a hospital

stay establishes that an impairment substantially limits major life activities would work a presumption that any condition requiring temporary hospitalization is disabling—a presumption that runs counter to the very goal of the ADA." *Id.* (quoting *Burch*, 119 F.3d at 317).

Here, Williams has provided nothing in the way of evidence to indicate that he continued to be disabled as of the date of his termination. In fact, the documentation before the Court from Williams' own physician indicates that Williams had no restrictions as of January 25, 2021 at the latest. *See* [33], Ex. 10 at p. 23. Similarly, he has provided nothing to indicate that he was substantially limited in his ability to perform any major life activities.

The other two ways in which a plaintiff can establish a "disability" for purposes of the first prima facie element are: "a record of such an impairment; or being regarded as having such an impairment.'" *McKnight*, 2022 WL 1342649 at *3. Williams has provided no evidence or argument to indicate that he intends to proceed under either of these potential avenues, and the Court likewise does not see them as being applicable.

Even assuming that Williams could establish a prima facie case, the District has provided multiple legitimate, nondiscriminatory reasons for its termination decision: "job performance, level of professional judgment, level of responsibilities, market forces, and/or budgetary concerns." [34] at p. 2. The District's Memorandum [34] also specifically notes that the final termination decision was made on February 10, 2021 "[a]fter Plaintiff repeatedly failed to show to work, and after multiple no-call, no-shows[.]" *Id.* at p. 30.

Thus, the burden would shift back to Williams to "to produce evidence from which a jury could conclude that the employer's articulated reason is pretextual." *Williams v. J.B. Hunt Transp., Inc.*, 826 F.3d 806, 811 (5th Cir. 2016) (quoting *Cannon v. Jacobs Field Servs. N.A., Inc.*, 813 F.3d 586, 590 (5th Cir. 2016)).

In his Response [36], Williams does not address any of these articulated reasons. Instead, he simply regurgitates much of the factual recitation set forth in the District's Memorandum [34]. Although the Court bears no obligation to sift through the record in search of questions of fact to support Williams' case, the Court does note that Williams, in his deposition, provided some explanation as to his failure to report to work in January 2021:

> Q.  So, this doctor is basically telling you you could go back to work the first of the year, isn't he?
>
> A.  Yes, he is.
>
> Q.  Okay. And so why didn't you go back the first, like, January 2021?
>
> A.  Because I still have issues. And this particular doctor almost caught a lawsuit himself because of a comment he made. If I can get my hands on the nurse that was in there with him, he would be in a lot of trouble.
>
> . . .
>
> Q.  Okay. So you just continued to stay your -- to stay on your [FMLA]?
>
> A.  No, I continued to stay in a safe place until I got some type of communication from Hollandale School District about my situation. I was still in contact. It's not like I walked off my job. I still had communication with my principal and other building administrators about my employment.
>
> Q.  So what was the school district supposed to do if your [FMLA] ran out?
>
> A.  The school district was supposed to have granted me permission to work from home while I was dealing with my issues and COVID.
>
> . . .
>
> Q.  Okay. But you don't know anybody who was allowed to work from home in January --

A.      No.

Q.      -- of 2021?

A.      Not from January. I don't know anybody from January. I don't know anybody from January.

Q.      So it's my understanding that you did -- after you were denied your accommodation to work from home, after your [FMLA] ended, it's my understanding that you did clock in on February the 8th, 2021. And if you want to reference your --

A.      I know what you're talking about.

Q.      -- Exhibit 1. On February the 8th of 2021, you clocked in at 7:44 a.m. but then clocked out at 8:37 a.m. So you were only there for 52 minutes. And on your calendar, you state, "Went to school parking lot. Did classes from car." So why did you do that?

A.      That was my attempt to show them that I was trying to work. I could at least work from home. My -- I mean, you're talking about a serious gallbladder surgery. I was -- my situation just wasn't right. . .

[33], Ex. 11 at p. 10, 11.

As this excerpt makes clear, Williams contends that he continued to suffer from medical issues in February 2021 and, additionally, that he did not simply refuse to appear for work but was instead in contact with appropriate school personnel as to his absences during the January 2021-February 2021 time period. However, as to his ongoing medical conditions, Williams has provided no documentation to support that contention. For instance, he attached to his Response [36] a document entitled "Medical Records." *See* [36], Ex. 5. That document, though, is only a summary page and provides no indication of what treatment was received, and there are only two visits for February 2021 indicated on the document. His actual medical records are contained in a separate exhibit entitled "Documents and Doctors' Excuses." *See* [36], Ex. 4. However, the latest record

14

contained in that collective exhibit is the "Return to Work/Return to School" form dated January 20, 2021. What's more, as emphasized above, that form specifically indicates that Williams had *no* restrictions. As to his absences, Williams does not dispute that he continued to be absent from work for several days prior to his termination but instead simply states that he was in contact with school personnel. He provides no further evidence of those conversations or their substance.

Summarizing, Williams has come forward with no evidence to indicate that the District's proffered reasons were a mere pretext to discriminate against him on the basis of a disability. His mere conclusory allegations are insufficient at this stage of the proceedings. *See*, *e.g.*, *Walls v. Pontotoc Health Servs., Inc.*, 2017 WL 1011478, at *2 (N.D. Miss. Mar. 14, 2017) (citing *TIG Ins. Co. v. Sedgwick James of Wash.*, 276 F.3d 754, 759 (5th Cir. 2002)) ("Conclusory allegations, speculation, unsubstantiated assertions, and legalistic arguments are not an adequate substitute for specific facts showing a genuine issue for trial.").

Williams' disability termination claim fails for numerous reasons, and the District is entitled to summary judgment on that claim. It is hereby dismissed.

### B.    Failure to Accommodate

To prove a failure to accommodate claim, a plaintiff must prove the following elements: "(1) the plaintiff is a 'qualified individual with a disability;' (2) the disability and its consequential limitations were 'known' by the covered employer; and (3) the employer failed to make 'reasonable accommodations' for such known limitations." *Trautman v. Time Warner Cable Tex., LLC*, 756 F. App'x 421, 430 (5th Cir. 2018) (quoting *Neely v. PSEG Tex., Ltd. P'ship*, 735 F.3d 242, 247 (5th Cir. 2013); *Feist v. La. Dep't of Justice, Office of the Attorney Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

In the preceding section, the Court already determined that Williams was not "disabled." The Court sees no need to again recite that analysis; but, in the same way that determination was dispositive of his discriminatory termination claim, it precludes his failure to accommodate claim.

But even if Williams could clear that hurdle, he could not survive summary judgment as to the third prima facie element. "When an employee 'requests a reasonable accommodation, the employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation.'" *Id.* (quoting *EEOC v. Agro Distrib.*, *LLC*, 555 F.3d 462, 471 (5th Cir. 2009)).

Here, Williams contends that he requested a reasonable accommodation—the opportunity to work from home—and that the District failed to comply with the ADA by not permitting him to do so.

"Reasonable accommodations include 'job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations.'" *Thompson v. Microsoft Corp.*, 2 F.4th 460, 467 (5th Cir. 2021) (quoting 42 U.S.C. § 12111(9)(B)). It should also be noted what the ADA does *not* require:

> The ADA does not require an employer to relieve an employee of any essential functions of his or her job, modify those duties, reassign existing employees to perform those jobs, or hire new employees to do so. Essential functions are those that bear more than a marginal relationship to the job at issue. In determining whether a function is essential, we look to the employer's judgment, written job descriptions, the amount of time spent on the job performing the function, and the consequences of not requiring the employee to perform the function.

*Id.* (citations and quotation marks omitted).

The Fifth Circuit has addressed whether a request to telework constituted a request for a reasonable accommodation for ADA purposes. *Credeur v. State of La.*, 860 F.3d 785 (5th Cir. 2017). There, Renee Credeur, an attorney with the Attorney General's Office for the State of Louisiana, developed significant health problems after undergoing a kidney transplant. *Id*. at 788. After teleworking for a period of time, Credeur sought an extension of her telework status which was eventually denied on the basis that "litigation attorneys cannot work from home on a long term basis as it places considerable strain on supervisors and staff." *Id*. at 791 (internal quotation marks omitted). Credeur ultimately filed suit, alleging that the Attorney General's Office violated the ADA by failing to accommodate her. *Id*.

The district court dismissed Credeur's claim, finding that "Credeur was not a 'qualified individual' within the meaning of the ADA because she could not perform an essential function of her job—regular attendance in the office." *Id*. On appeal, the Fifth Circuit affirmed. *Id*. In doing so, the Fifth Circuit discussed regular work-site attendance requirements in the ADA context:

> As an initial matter, there is general consensus among courts, including ours, that regular work-site attendance is an essential function of most jobs. *See*, *e.g.*, *Hypes on Behalf of Hypes v. First Commerce Corp.*, 134 F.3d 721, 727 (5th Cir. 1998) (per curiam). . . This is especially true when the position is interactive and involves a significant degree of teamwork. . .
>
> The EEOC's informal guidance on telework reinforces this point. The agency recognizes that for some jobs, the essential duties can only be performed in the workplace. Teleworking may not be feasible, for example, if the job requires 'face-to-face interaction and coordination of work with other employees', 'in-person interaction with outside colleagues, clients, or customers', or 'immediate access to documents or other information located only in the workplace.' . . . Additionally, 'the employer's ability to supervise the employee adequately' is another factor in determining whether a work-at-home accommodation is reasonable. Direct employee supervision is easiest when the employee shows up regularly at work. It is much harder to do remotely, particularly when the employee never comes to the office at all.

*Id*. at 793 (some citations omitted).

The Fifth Circuit, reviewing the evidence, held that although Credeur alleged that there were no problems with her working from home, "the record demonstrates that her continuous absence created a strain on the office." *Id*. at 795. As noted above, the Fifth Circuit affirmed the district court's dismissal of her failure to accommodate claim. *Id*.

In the case at bar, the District had in place a policy regarding in-person attendance for teachers. The District's policy provided, in pertinent part:

> Teachers will work from their campus classrooms or another designated area in the district and will shift back to in-person teaching at their campus in the event it is no longer necessary for them to instruct virtually.

[33], Ex. 13 at p. 49.

Despite Williams' contention that he should have been permitted to work from home, he has provided no explanation as to how the District's policy was unlawful. This Court finds pertinent the Fifth Circuit's holding in *Credeur*, where the court held that "[w]hile we are mindful that employees can be good sources of information regarding their day-to-day activities and the prerequisites for success on the job, 'an employee's unsupported testimony that she could perform her job functions from home' does not create a genuine dispute of fact to preclude summary judgment." *Credeur*, 860 F.3d at 793 (quoting *EEOC v. Ford Motor Co.*, 782 F.3d 753, 763-64 (6th Cir. 2015)). Williams' argument is just that—unsupported testimony that he could perform his job from home. That is insufficient to preclude summary judgment, particularly in light of the District's clear policy requiring in-person attendance for teachers. Williams' failure to accommodate claim cannot survive summary judgment. It is dismissed.

*C.*    *Comparators*

Williams also alleges that the "terms and conditions of [his] employment differ[ed] from those of similar employees." [1] at p. 3. It is unclear to the Court if Williams intended to assert this as a separate claim or as a way in which to establish pretext in support of his disability termination claim, but the Court will address it nonetheless.

In his deposition, Williams identified two individuals who he contends the District treated more favorably in regard to teleworking:

> Q.    But we're talking about January 2022. I just need to know - - I mean, you're claiming that other employees at that time were allowed to work at home. I just need to know the name of those employees.
>
> A.    Oh, that's -- in January?
>
> Q.    Yes.
>
> A.    I wouldn't know in January.
>
> Q.    Okay.
>
> A.    But overall were allowed to work from home because of the COVID situation and health issue, yeah. There were plenty of people that worked from home.
>
> Q.    But what time -- I mean, I'm talking about when you were not given that option in January 2022?
>
> A.    I don't know about January.
>
> Q.    So what -- when are you talking about? Like, when were these other teachers allowed to work at home?
>
> A.    From whenever they allowed -- well, whenever they needed to. I'm going to say from August on up to whenever. I mean, that's a whole year. I mean, I can't tell you exactly which one did it; when. But I know there was some that were allowed to work from home.

Q.      So who was allowed to work from home, specifically in -- from August to December 2021?

A.      Well, I'm going to say Dr. Willis.

. . .

Q.      Well, let me just read the question. I said, "Interrogatory number 22 states: You claim that other employees were able to work from home during the same time as you requested to do so. Please list the names of the employes who were allowed to work from home." And your Answer to Interrogatory No 22 was: "Dr. Mario Willis, and Ms. McDougal." So I should have probably been a little clearer in that interrogatory and stated in January of [2022] --

A.      Yeah.

Q.      -- you know, who was working from home?

A.      Well, in January, I couldn't tell you, in January itself.

Q.      Okay. So when are you saying that -- and we've gone through a lot about Dr. Willis and when you believe he was working from home. When was Ms. McDougal allowed to work from home?

A.      This was earlier. I know this was before January. I know that.

. . .

Q.      Do you know why she was allowed to work from home?

A.      Because she made the request. I'm going to put it to you like this. And there are certain people on the campus that get this type of reaction, and there's certain people that don't. The TFAs, and they don't get as much crap as we do, because they have people to protect them. . . But other people, especially people from the community or whatever, it's free game.

Q.      So, do you know if Ms. McDougal worked from home because she had COVID?

A.      I don't know if she had COVID or not. All I know is she made the request, and it was given.

> Q.     How do you know she made the request?
>
> A.     Because she was allowed to work from home. And if she was allowed to work from home without making a request, that means she was supposed to have been terminated.

[33], Ex. 11 at p. 7, 14-15.

Thus, although not artfully stated, Williams has identified Willis and McDougal as comparators.

"[A]n employee who proffers a fellow employee as a comparator [must] demonstrate that the employment actions at issue were taken under nearly identical circumstances. This requires, among other things, that the comparator shares the same job or responsibilities." *Credeur*, 860 F.3d at 795 (quoting *Lee v. Kansas City S. Ry. Co.*, 574 F.3d 253, 260 (5th Cir. 2009)). "In practical effect, this standard renders employees not similarly situated when, compared to the plaintiff, the employees have different work responsibilities or different supervisors, or work in different company divisions, or were subject to adverse employment actions too removed in time or for violations too dissimilar in type." *Hoffman v. Baylor Health Care Sys.*, 597 F. App'x 231, 236 (5th Cir. 2015) (per curiam) (citing *Lee*, 574 F.3d at 260).

Neither of the proposed comparators meet this standard. At all pertinent times, Willis served as the District's Superintendent, whereas Williams was a special education teacher. Williams makes no explanation as to how their job responsibilities were similar and does not even allege that Dr. Willis taught any classes whatsoever. The Court easily finds that Willis is not a proper comparator for purposes of Williams' discrimination claim.

Williams' comparison to McDougal also fails. Stated simply, Williams has failed to come forward with sufficient evidence to support this claim. For instance, he never provides any explanation as to McDougal's job title or job responsibilities. And in his Response [36], while

making reference to Willis, he does not even address McDougal whatsoever. *See* [36] at p. 5. A mere reference to another person without further explanation or evidence to support the same is simply insufficient for summary judgment purposes. *See*, *e.g.*, *Walls*, 2017 WL 1011478 at *2.

To the extent Williams intended to assert the different terms and conditions of employment as a separate claim, it is dismissed.

### D.    Retaliation

To establish a prima facie retaliation claim, a plaintiff must prove: "(1) [he] engaged in an activity protected by the ADA; (2) an adverse employment action occurred; and (3) a causal connection exists between the protected act and the adverse action." *Credeur*, 860 F.3d at 797 (citing *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999)). "Once the plaintiff has established a prima facie case, the defendant must come forward with a legitimate, non-discriminatory reason for the adverse employment action. If such a reason is advanced, the plaintiff must adduce sufficient evidence that the proffered reason is a pretext for retaliation. Ultimately, the employee must show that 'but for' the protected activity, the adverse employment action would not have occurred." *Seaman*, 179 F.3d at 301 (citing *Sherrod v. Am. Airlines, Inc.*, 132 F.3d 1112 (5th Cir. 1998)).

This claim fails for many of the same reasons addressed in connection with the general disability discrimination claim—specifically, because Williams has done nothing to establish that the District's articulated reasons for terminating him were pretextual. In fact, the only evidence before the Court, such as the documentation indicating Williams' continued absences from work despite having no work restrictions, supports the District's position. The Court has already addressed these matters in more detail above and sees no need to fully recite that analysis here.

Summary judgment is granted in the District's favor on the retaliation claim. That claim is dismissed.

E.     Harassment

A plaintiff must establish five elements to prove a prima facie case of disability-based harassment:

> (1) that [he] belongs to a protected group; (2) that [he] was subjected to unwelcome harassment; (3) that the harassment complained of was based on [his] disability or disabilities; (4) that the harassment complained of affected a term, condition, or privilege of employment; and (5) that the employer knew or should have known of the harassment and failed to take prompt, remedial action.

Credeur, 860 F.3d at 795-96 (quoting Flowers v. S. Reg'l Physician Servs. Inc., 247 F.3d 229, 235-36 (5th Cir. 2001)).

In an interrogatory, the District specifically asked Williams to provide an explanation of his harassment claim. He provided the following response:

> **INTERROGATORY NO. 23:** As part of your Complaint, you claim you faced harassment at the School District. Please give a detailed account as to how you were harassed.
>
> **[RESPONSE TO] INTERROGATORY NO. 23:** My COVID pay was taken by orders of Dr. Willis after producing the proper forms three time[s] to my principal Mr. Matthews. I was also, moved from two safe clean locations and placed in a room used for storage. I asked several times to be moved to one of the 5 empty rooms available and they were all denied.

[33], Ex. 1 at p. 12, 21.

To provide context as to the COVID pay allegation, Williams alleges that the District withheld payment for time that he missed due to having COVID-19. However, in his deposition, Williams admitted to eventually receiving the payment. See [33], Ex. 11 at p. 4.

Regarding the other part of his allegation, although the above response did not provide context as to the applicable timeline, in another response Williams explained: "[t]he harassment continued with me not having a safe place to work. With several vacant rooms they [chose] to place me in the room used as storage. I went into the room for days to check and see if they had cleaned it out and it was not *as of October 12, 2020*." *Id*. at p. 16 (emphasis added).

The timeline is important because Williams did not undergo his surgery until October 15, 2020—*after* the alleged harassment occurred. Thus, setting aside all other issues associated with the claim, it must fail. It defies logic for any alleged harassment to be based on Williams' disability yet have occurred prior to Williams allegedly becoming disabled.

The Court sees no need to address any further issues associated with Williams' harassment claim. Summary judgment is granted in the District's favor, and that claim is dismissed.

*Conclusion*

For the reasons set forth above, the District's Motion for Summary Judgment [33] is GRANTED. All of Williams' claims are hereby DISMISSED *with prejudice*. A Final Judgment consistent with this Order and Memorandum Opinion will issue this day. This CASE is CLOSED.

SO ORDERED, this the 5th day of December, 2023.


/s/ Sharion Aycock
UNITED STATES DISTRICT JUDGE